**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THE CASSINA GROUP, LLC, on Behalf of Itself and All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | |
| vs. | |
| NATIONAL ASSOCIATION OF REALTORS; CALIFORNIA ASSOCIATION OF REALTORS, INC; FLORIDA ASSOCIATION OF REALTORS; ILLINOIS ASSOCIATION OF REALTORS; MICHIGAN ASSOCIATION OF REALTORS; NEW YORK STATE ASSOCIATION OF REALTORS, INC.; PENNSYLVANIA ASSOCIATION OF REALTORS; SOUTH CAROLINA ASSOCIATION OF REALTORS | **JURY TRIAL DEMANDED** |
| Defendants. | |

**<u>CLASS ACTION COMPLAINT</u>**

Plaintiff, the Cassina Group, LLC, on behalf of itself and all others similarly situated, brings this antitrust class action against Defendants The National Association of Realtors ("NAR"); California Association of Realtors, Inc; Florida Association of Realtors; Illinois Association of Realtors; Michigan Association of Realtors; New York State Association of Realtors, Inc.; Pennsylvania Association of Realtors; and South Carolina Association of Realtors for violations of federal antitrust and state unjust enrichment laws. Based upon information and belief, and the investigation of counsel, Plaintiff alleges as follows.

## INTRODUCTION

1.     This is an antitrust class action seeking damages and injunctive relief for violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, concerning a NAR requirement that its members pay membership fees to NAR as well as to a state and a local real estate association.

2.     Plaintiff brings this action on behalf of itself, and all other similarly situated NAR member real estate brokers and agents, who were required to become members of and pay membership fees to: (i) NAR; (ii) a state real estate association; and (iii) a local real estate association in accordance with the NAR requirements from August 19, 2024 until the present (the "Class Period").

3.      NAR members are required to pay membership dues to three real estate associations.[1] NAR's "three-way agreement" violates the antitrust laws because it eliminates competition in the market for real estate association membership between the national, state and local real estate membership associations and artificially inflates or stabilizes membership dues among these associations.

---

[1] https://www.nar.realtor/about-nar/policies/the-three-way-agreement (stating "the 'Three-way Agreement' [ ] means that all associations and their REALOTRS® members are members of the state association of REALOTRS® in the state where their association is located and also of the National Association of REALOTRS®.").

4.      Absent this requirement, NAR members would have the competitive choice of deciding which associations to join. This would foster an environment where associations compete with one another on real estate membership fees and service.

5.      This "three-way agreement" membership requirement also serves as a condition precedent for NAR members who desire access to lockboxes at properties listed on a NAR Multiple Listing Service ("MLS"). A "lockbox" is a device which securely holds the key(s) to a property and allows authorized NAR brokers/agents to access the device in order to obtain the property keys and access the property.

6.      NAR Policy Statement 7.31 mandates that "any lockbox system must be designated as either an activity of an association of REALTORS® or an association-owned and operated MLS," and "if the lockbox system is an activity of an association of REALTORS®, then every REALTOR® and REALTOR-associate® and every non-principal broker, sales licensee and licensed or certified appraiser affiliated with a REALTOR®, shall be eligible to hold a key subject to their execution of a lease agreement with the association."[2]  This establishes a framework in which local REALTOR® association membership is the only way for brokers and agents to gain access to real estate lockboxes in most local real estate markets throughout the U.S.

7.      NAR's implementation of the "three-way agreement" as a condition precedent for NAR brokers and agents to use lockboxes has led NAR brokers and agents to become deprived of a "competitive choice" by being forced to obtain memberships in three real estate associations to obtain lockbox access.

---

[2] https://cdn.nar.realtor/sites/default/files/documents/handbook-on-mls-policy-2024-06-28.pdf?_gl=1*tjbvvf*_gcl_au*MTU1MDk4Mjc4MC4xNzE3NjEyNDY1

8.     As a direct and proximate result of NAR's "three-way agreement" and NAR Policy Statement 7.31, Plaintiff sustained antitrust injury and was forced to pay artificially inflated membership dues in violation of Section 1 of the Sherman Act and state unjust enrichment laws.

## THE PARTIES

9.     Plaintiff, the Cassina Group, LLC, is a real estate firm in the State of South Carolina.  Plaintiff has been forced to pay for redundant realtor association memberships.  Plaintiff will continue to be injured in its business or property unless the requested declaratory and injunctive relief is granted.

## DEFENDANTS

10.     Defendant National Association of Realtors ("NAR") is a trade association organized under the laws of Illinois with its principal place of business at 430 North Michigan Avenue, Chicago, Illinois. NAR is a national trade association of state and regional real estate associations, brokers, agents and other licensed entities and individuals that conduct business in the market for real estate services. With over 1.5 million members, NAR is the largest trade association in the United States. NAR members consist of over 1,200 local realtor associations as well as fifty four state and territorial realtor associations.  NAR establishes and enforces rules, policies and practices that are adopted by NAR member state and local realtor associations and by member real estate professionals who are engaged in real estate brokerages across the United States. NAR holds a U.S. trademark over the term REALTOR®. All of NAR's state and local realtor association members and its members that are real estate agents and brokers are part of the greater NAR REALTOR® trade association network.

11.     Defendant California Association of Realtors, Inc., is a trade association organized under the laws of the state of California with its headquarters at 525 South Virgil Avenue, Los

Angeles, California. Defendant California Association of Realtors, Inc. offers memberships to brokers and agents throughout the state of California

12.     Defendant Florida Association of Realtors is a trade association organized under the laws of Florida with its headquarters at 7025 Augusta National Drive, Orlando, Florida. Defendant Florida Association of Realtors offers memberships to brokers and agents throughout the state of Florida

13.     Defendant Illinois Association of Realtors is a trade association organized under the laws of Illinois with its headquarters at 522 South Fifth Street, Springfield, Illinois. Defendant Illinois Association of Realtors offers memberships to brokers and agents throughout the state of Illinois.

14.     Defendant Michigan Association of Realtors is a trade association organized under the laws of Michigan with its headquarters at 720 North Washington Avenue, Lansing, Michigan. Defendant Michigan Association of Realtors offers memberships to brokers and agents throughout the state of Michigan.

15.     Defendant New York State Association of Realtors, Inc. is a trade association organized under the laws of New York with its headquarters at 130 Washington Avenue, Albany, New York. Defendant New York State Association of Realtors, Inc. offers memberships to brokers and agents throughout the state of New York.

16.     Defendant Pennsylvania Association of Realtors is a trade association organized under the laws of Pennsylvania with its headquarters at 500 North 12th Street, Lemoyne, Pennsylvania. Defendant Pennsylvania Association of Realtors offers memberships to brokers and agents throughout the state of Pennsylvania.

17.     Defendant South Carolina Association of Realtors is a trade association organized under the laws of South Carolina headquartered at 3780 Fernandina Road, Columbia, South Carolina. Defendant South Carolina Association of Realtors offers memberships to brokers and agents throughout the state of South Carolina.

## JURISDICTION AND VENUE

18.     The anticompetitive rules, policies, and practices alleged in this Complaint violate the Sherman Act (15 U.S.C. §1). The relevant NAR agreements have routinely been adopted, applied, and enforced in this District for the relevant period.  The NAR agreements govern the conduct of local real estate brokers and local real estate sales agents conducting real estate business. Defendants have engaged in interstate and intrastate commerce through implementing and enforcing the NAR agreements, which require redundant membership fees and condition the payment of such fees to lockbox access.

19.     NAR transacts business throughout the United States. NAR's rules, policies, and practices govern the conduct of its members in all 50 states, including the conduct of NAR's REALTOR® real estate association members and the conduct of NAR's individual member brokers and their affiliated agents and sales associates.

20.     Defendant NAR transacts substantial business in this District through the collection of dues. Venue is appropriate in this District under Section 12 of the Clayton Act 15 U.S.C. § 22.

21.     Defendants have received millions of dollars in revenue, unlawfully obtained through the implementation of and forced adherence to NAR's requirements emanating from NAR's headquarters which is situated within this District.

22.     In addition to subject matter jurisdiction existing based upon the federal Sherman Act allegations, this Court also has jurisdiction under 28 U.S.C. §1332(d)(2), because the putative

Class contains thousands of persons or entities, the aggregate amount in controversy exceeds $5,000,000, and at least one Class member is a citizen of a State different than Defendants. The Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. §1367.

23.     This Court has personal jurisdiction over Defendants which: (i) transacted substantial business from NAR headquarters or offices in this District; (ii) transacted business with members of the Class in this District; (iii) had substantial presence and contacts in this District; and (iv) committed unlawful acts in furtherance of Defendants' actions in this District.

24.     Venue is proper in this District under 15 U.S.C. § 22 and under 28 U.S.C. §1391(b), (c), and (d). Defendants transacted business, can be found, or have offices and/or agents in this District; a substantial part of the events giving rise to Plaintiff's claims arose in and from this District; and a substantial portion of the affected trade and commerce described herein has been carried out in and from this District.

## FACTUAL ALLEGATIONS

### A.     The Real Estate Market

25.     Real estate transactions in the United States typically occur between a real estate owner selling property ("Seller") and a person who is buying real estate ("Buyer").

26.     Real estate Sellers and Buyers are usually represented by state licensees: (i) the real estate broker (also known as a "brokerage firm"); and (ii) the individual real estate licensee or agent. Brokers and brokerages, as sponsors, are legally responsible for the actions of their licensed realtors or agents.

27.     Only a licensed broker is typically permitted to represent a Seller or a Buyer in a real estate transaction. Real estate brokerage contracts with Sellers and Buyers are with brokers, not agents, for this reason, and all payments to individual realtors or agents pass through brokers.

The vast majority of real estate Sellers and Buyers across the country utilize a broker to assist in a real estate transaction.[3]

28.     In a typical real estate transaction, the Seller retains her or his own broker and a real estate Buyer typically retains her or his own broker.

29.     Real estate brokers and agents typically join The National Association of Realtors in order to obtain the title of REALTOR®. NAR holds a U.S. trademark over the term REALTOR®. NAR defines REALTOR® as follows:

> **REALTORS®** are licensed professionals who facilitate property transactions between buyers and sellers and are members of NAR (National Association of REALTORS®), adhering to a strict Code of Ethics and high standards of conduct. All REALTORS® are licensed real estate professionals, but not all real estate agents are REALTORS®.[4]

**B.     NAR Mandatory Triple Membership & Associate Dues**

**1.     MLSs**

30.     NAR established and continues to enforces the agreements, policies, and practices, that are adopted by NAR's 1,200+ local associations (also called "Member Boards") and their affiliated MLSs that govern the conduct of NAR's approximately 1.5 million-member REALTORS® who are engaged in real estate brokerages across the United States.

31.     MLSs facilitate the publishing and sharing of information about real estate for sale in a geographic area. The membership of an MLS is generally comprised of nearly all real estate brokers and their affiliated agents in an MLS's service area. The geographic coverage of the MLS

---

[3] In 2022 in the U.S., 89% of Buyers purchased their home using the assistance of a real estate agent and 89% of Sellers sold their home with assistance from a real estate agent. *Quick Real Estate Statistics*, NAT'L ASS'N OF REALTORS (July 12, 2023), https://www.nar.realtor/research-and-statistics/quick-real-estate-statistics

[4] https://www.nar.realtor/about-nar/when-is-a-real-estate-agent-a-realtor

serving an area normally establishes the geographic market in which competition among brokers occurs.

32.     In each area an MLS serves, the MLS will include or "list" the vast majority of real estate that is for sale through a real estate broker in that area. In most areas, the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's real estate listings. Listing brokers will use the MLS to market sellers' properties to other broker and agent participants in the MLS and, through those other brokers and agents, to potential real estate buyers.

33.     NAR, through its Member Boards, controls a substantial number of the MLSs in the United States. NAR promulgates rules, policies, and practices governing the conduct of NAR affiliated MLSs that are set forth annually in the *Handbook on Multiple Listing Policy* ("Handbook"). Under the terms of the Handbook, affiliated REALTOR® associations and MLSs "must conform their governing documents to the mandatory MLS policies established by [NAR's] Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program." National Association of REALTORS®, Handbook on Multiple Listing Policy 2020 (32nd ed. 2020), at iii.

34.     NAR and its affiliated REALTOR® associations and MLSs enforce the Handbook's rules, policies, and practices as well as the rules, policies, and practices codified in NAR's Code of Ethics. NAR's Code of Ethics states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association." National Association of REALTORS®, Procedures for Consideration of Alleged Violations of Article IV, Section 2, Bylaws.

35. NAR's and its affiliated associations and MLSs' adoption and enforcement of these rules, policies, and practices, which are described in more detail below, reflect concerted action between horizontal competitors and constitute agreements among competing real estate brokers.

### 2. The "Three-Way Agreement"

36. A cornerstone of the NAR REALTOR® organizational system is what is known as the "three-way agreement."[5] On the one hand, that agreement grants state and local associations the ability to control the terms REALTOR® and REALTOR-ASSOCIATE®, while state and local associations must adhere to the NAR Code of Ethics and enforce it within their respective jurisdictions while they must also properly regulate the use of the terms REALTOR® and REALTOR-ASSOCIATE® within their respective jurisdictions.[6] "The Three-Way Agreement [also] means that local associations and their REALTOR® members are members of the state association of their local board, and NAR."[7]

37. NAR has gone so far as to bluntly state, "[i]n order to maintain REALTOR® membership, members must pay local, state, and national association dues and assessment."[8] A REALTOR® must, therefore, join all three levels of REALTOR® association or none at all. According to NAR, "[t]here is no ability to bifurcate membership between local, state, or national associations."[9]

38. As noted above, licensees that choose to hold REALTOR® membership pay their dues individually to NAR, their respective state association and at least one of the local

---

[5] https://www.car.org/-/media/CAR/Documents/Your-CAR/PDF/Member-Dues-and-Benefits/2023-Frequently-Asked-Questions.pdf

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

REALTOR® associations within their state. In Illinois, for example, depending upon which local Illinois REALTOR® association a licensee joins, a full year of mandatory linked triple REALTOR® association membership costs, coupled with MLS fees, amounts to approximately $1,251.[10] That is equivalent to more than 2.7% of the average annual income of U.S. real estate agents, which is $46,014. [11] It is also the equivalent to more than 2.8% of the average annual income of Illinois real estate agents which is $44,510.[12] Failure to join one of the 21 local Illinois REALTOR® associations (such as the Chicago Association of REALTORS®), the state level NAR or NAR likely means expulsion from all three. This would lead to blocked access to the real estate lockbox system—rendering a broker or agent unable to access and perform the essential task of showing real estate to potential buyers, despite holding an active Illinois real estate license.

39.     The NAR mandated three-way agreement is compulsory irrespective of the fact that it is both redundant and financially burdensome for brokers and agents. It makes access to real estate lockboxes contingent upon costly triple REALTOR® association membership which many properly licensed agents and brokers can ill afford.

40.     The mandatory three-way agreement has ensured a guaranteed membership base and has generated huge revenue for NAR and state and local REALTOR® associations throughout the country, making the reasons for its imposition entirely clear. It has also insulated these entities from competition for real estate trade association membership. Absent the three-way agreement, NAR, along with, state and local trade associations would have to compete on the cost of

---

[10] https://chicagorealtor.com/membership/renew-membership/

[11] https://www.nar.realtor/agent-income

[12] https://www.forbes.com/sites/andrewdepietro/2023/10/04/how-much-real-estate-agents-earn-in-every-state-in-2023/

membership dues, fees and quality of services offered to attract dues paying broker and agent members.

41.     The mandatory three-way agreement allows NAR, state-level and local trade associations to dispense with such competition.

42.     Because the three-way agreement requires brokers and agents to join all three associations or face exclusion from performing an essential function of their real estate services, brokers and agents have little choice but to comply with the three-way agreement. This allows NAR, and the state and local trade associations to charge exceedingly high member dues, application fees and service fees.

**C.     NAR MLS (Lockbox) Policy**

43.     NAR and its affiliated MLSs have also adopted a series of rules (set forth in NAR 2024 Handbook on Multiple Listing Policy) that effectively limit access to lockboxes to only those real estate brokers that are members of NAR REALTOR® network and subscribe to a NAR-affiliated MLS. NAR MLS Policy Statement 7.31 mandates that "any lockbox system must be designated as either an activity of an association of REALTORS® or an association-owned and operated MLS."  MLS Policy Statement 7.7 further states that "[t]o the extent permitted by law, the National Association remains firmly and unequivocally committed to the principle that association membership is a reasonable condition of participation in the association's multiple listing service providing membership in the association is readily available to all eligible and qualified individuals on reasonable and nondiscriminatory terms and conditions."  This establishes an association/MLS membership framework which in most states requires membership in a local REALTOR® association in order for a broker or agent to gain access to lockbox services.

44.     Licensed, but non-NAR-affiliated brokers are in most local markets not allowed to access lockboxes, thereby depriving those brokers of the ability to show real estate listed for sale. This policy and practice effectively deprive licensed real estate brokers that are not members of NAR from accessing properties for sale, thereby lessening competition for real estate broker services.

45.     NAR, and its affiliated MLSs' adoption and enforcement of these rules, policies, and practices reflect concerted action between horizontal competitors. Such agreements, individually and collectively, constitute unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**D.      The Relevant Market**

46.     The relevant market for the claims asserted herein is the market for real estate trade association membership.

47.     The relevant geographic market for the claims asserted herein is the United States.

48.     NAR and its members collectively provide the vast majority of real estate broker services in the United States.

49.     Any real estate agent who wished to compete outside of Defendants' unlawful agreements/system would face significant barriers.

50.     A non-NAR Broker would lose lockbox access to the large majority of lockbox properties.  Brokers/agents cannot conduct business effectively without access to the lockboxes.

51.     An alternative system would enable greater competition in associational membership and greater competition among brokers and agents.

**E.      Anti-Competitive Effects**

52.     Defendants' unlawful agreement has caused, and is causing significant anti-competitive effects, which include, but are not limited to, the following:

- Forcing brokers and agents to pay memberships fees in three associations;
- Fixing, raising, maintaining, or stabilizing artificially high membership fees; and
- Restraining competition in the market for real estate association membership.

53.     Even if Defendants raise any alleged pro-competitive effects, they are substantially outweighed by Defendants' unlawful agreements anti-competitive effects.  Substantial economic evidence supports the view that Defendants' unlawful agreements have resulted in inflated membership fees at levels far above what a competitive market would produce.

**F.     Class Action Allegations**

54.     Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of itself and the following Class:

> All persons or entities that, from August 19, 2020 through the present, paid or provided reimbursement for membership fees to: (i) the National Association of Realtors®; (ii) a state Realtor®  association; and (iii) a local Realtor® association in the United States in accordance with the NAR requirements.

55.     Excluded from the Class are Defendants and their officers and directors, the judicial officers presiding over this action and the members of their immediate families, Plaintiff's counsel, and employees of their respective law firms.

56.     The Class is readily ascertainable because membership records exist at NAR and at the State Associations.

57.     Due to the nature of the trade and commerce involved, Plaintiff believes that the Class has many thousands of members, the exact number and their identities being known to Defendants.

58.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class.

59.     There are questions of law and fact common to the members of the Class, including, but not limited to, the following:

        a)   whether the unlawful agreements harmed competition, as alleged herein;

        b)   whether the competitive harm from the unlawful agreements substantially outweighs any competitive benefits;

        c)   whether the antitrust violations alleged herein resulted in artificially inflated NAR, State and local membership fees and;

        d)   what are the appropriate class-wide measures of damages.

60.     Plaintiff has retained counsel competent and experienced in the prosecution of antitrust class action litigation to represent it and the Class.

61.     Questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class.

62.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of the members of the Class to seek redress for the violations of law alleged herein.

## CLAIMS FOR RELIEF

## COUNT I

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. §1

63.     Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

64.     Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

65.     The contract, combination, or conspiracy alleged herein is a violation of Section 1 of the Sherman Act and has consisted of continuing agreement between NAR and its association members to require real estate brokers and agents to become members of NAR, a state real estate association *and* one or more local real estate associations.

66.     In furtherance of the contract, combination, or conspiracy, Defendants have committed the following overt acts by participating in the establishment, implementation, and enforcement of NAR agreements and other anti-competitive rules. This harm to competition substantially outweighs any competitive benefits.

67.     Defendants' unlawful agreements have caused  real estate brokers and agents to pay artificially inflated membership dues in three associations. Plaintiff and the other members of the Class have paid these inflated membership fees and will continue to do so unless this requirement is invalidated.

68.     Absent Defendants' unlawful agreements, Plaintiff and the other Class members would have paid lower membership fees.

69.     Defendants' unlawful agreements constitute a *per se* violation of Section 1 of the Sherman Act because it fixes, raises, maintains and/or stabilizes real estate trade association membership fees and substantially reduces competition in the market for membership in real estate trade associations.  Alternatively, Defendants' agreements are unlawful under the Rule of Reason as the procompetitive benefits of their actions are outweighed by the anti-competitive effects.

70.     As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiff and the other Class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

<u>COUNT II</u>

**DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT AND SECTION 16 OF THE CLAYTON ACT**

71.     Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

72.     Plaintiff seeks declaratory and injunctive relief under federal antitrust laws.

73.     As set forth in Count 1, Defendants have violated Section 1 of the Sherman Act, 15 U.S.C. §1.

74.     Plaintiff and Class members have been injured in their business or property by reason of Defendants' antitrust violations. Their injury consists of being forced to pay artificially inflated membership dues for three associations. These injuries will continue unless halted.

75.     Plaintiff and Class members, pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. §2201(a), hereby seek a declaratory judgment that Defendants' conduct constitutes a violation of Section 1 of the Sherman Act.

76. Plaintiff and Class members further seek equitable and injunctive relief, pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, and other applicable law, to correct the anti-competitive effects caused by Defendants' unlawful conduct.

## COUNT III

### UNJUST ENRICHMENT

77. Plaintiff hereby repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

78. Plaintiff brings this action on behalf of the proposed Class.

79. To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

80. Defendants have reaped and retained substantially higher profits due to their unlawful agreements and scheme.

81. Plaintiff and Class members have conferred and continue to confer an economic benefit upon Defendants in the form of membership fees resulting from NAR's anticompetitive rules and provisions, as described herein, to the economic detriment of Plaintiff and Class members.

82. Defendants' financial gain from its unlawful conduct is traceable to overpayments by Plaintiff and Class members.

83. Defendants have benefited from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from overpayments made by Plaintiff and Class members stemming from NAR's anticompetitive rules and provisions.

84. The financial benefits that Defendants derived from overcharging Plaintiff and Class members is a direct and proximate result of Defendants' unlawful practices described herein.

85. The financial benefits Defendants derived are ill-gotten gains that rightfully belong to the Plaintiff and Class members who paid, and continue to pay, inflated real estate association membership fees.

86. It would be wrong and inequitable for Defendants to be permitted to retain any of the overcharges that Plaintiff and Class members paid, and continue to pay, as a result of Defendants' unlawful practices described herein.

87. Defendants should be compelled to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of the Plaintiff and Class members.

88. Plaintiff and Class members are entitled to an amount equal to Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct, and to the establishment of a constructive trust consisting of such amount, from which Plaintiff and Class members may make claims on a *pro rata* basis.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed Class, prays for judgment against Defendants as to each and every claim made herein and for the following relief:

A. That the Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B. That the Court enter an Order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

C. That the Court award Plaintiff and the other Class members damages and/or restitution in an amount to be determined at trial;

D. That the Court award Plaintiff and class members pre- and post-judgment interest;

E. That the Court award Plaintiff and class members their costs of suit, including reasonable attorneys' fees and expenses;

F. That the Court award Plaintiff and the Class a permanent injunction, under Section 16 of the Clayton Act, enjoining Defendants from continuing conduct determined to be unlawful; and

G. That the Court award such other relief as it may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff, on behalf of itself and all others similarly situated, hereby demands a jury trial of all issues so triable.

Dated: August 16, 2024

Respectfully submitted,

*/s/ Marvin A. Miller*
Marvin A. Miller
Mathew Van Tine
**MILLER LAW LLC**
53 W. Jackson Blvd., Suite 1320
Chicago, Illinois 60604
Telephone: (312) 332-3400
MMiller@millerlawllc.com
MVantine@millerlawllc.com

Michael M. Buchman
Nathaniel Blakney
Hannan Seirafi
**MOTLEY RICE LLC**
800 Third Avenue, Suite 2401
New York, New York 10022
Telephone: (212) 577-0050
mbuchman@motleyrice.com
nblakney@motleyrice.com
hseirafi@motleyrice.com

P. Graham Maiden
**MOTLEY RICE LLC**
28 Bridgeport Blvd.
Mount Pleasant, South Carolina 29464

Telephone: (843) 216-967050
gmaiden@motleyrice.com

*Counsel for Plaintiff the Cassina Group,*
*LLC*